FRIEDMAN, Circuit Judge.
 

 This is an appeal by the United States from a judgment of the United States Claims Court that permanently enjoined the United States from awarding a contract to supply automated data processing and related services to the Antitrust Division of the United States Department of Justice. 1 Cl.Ct. 352 (1983). The award was enjoined on the ground that the relationship between officials in the Antitrust Division who participated in the process through which the contractor was selected and an officer of the firm to which it appeared the contract would be awarded violated ethical standards of conduct for government employees, created the appearance of impropriety, and resulted in prejudice in favor of that firm and against other firms seeking the contract. We reverse.
 

 I
 

 The following description of the procedures by which the Department of Justice (“the Department”) evaluated the bids in
 
 *1570
 
 this case and of the relationships among the persons involved is based upon the findings of the Claims Court, considerably amplified by the uneontradicted evidence in the record. In the subsequent portions of this opinion, we discuss some of these matters in greater detail.
 

 A. On September 3, 1982, the Department of Justice issued a request for proposals (“the proposal”) to supply automated data processing and litigation support services to the Information Systems Support Group (“the Group”) in the Department’s Antitrust Division through a “baseline services contract.” The Group is a section in the Antitrust Division that provides office automation, management information systems, and economic analysis services to the Division. Since there are “great fluctuations” in the Division’s need for litigation support services, the Group’s limited staff (27) sometimes cannot supply those services. The Group therefore uses contractors to provide the services it cannot supply through its own staff.
 

 In employing such outside contractors, the Department has used short term, sole-source, noncompetitive contracts that are subject to extension. Several of the firms that submitted proposals in this case, including the appellee CACI Industries, Inc. (“CACI”), were then supplying services to the Antitrust Division under such contracts.
 

 The proposal in this case involved a two-step competitive and negotiated, bidding process, for a single contractor to supply many of the services that separate contractors previously had provided. First, prospective contractors were to submit an initial proposal. After government officials evaluated these bids and selected those deemed competitive, those bidders were invited to negotiation sessions which focused on improving their offers. Each of those firms then would submit its “best and final” offer, from which the government would select the offer it considered most advantageous.
 

 Under the proposal, each bid was to contain two separate parts: a “technical proposal” and a “business management” proposal containing cost and price information. Each part was separately evaluated in both the initial and final phases of the bid process. The technical proposal was to be evaluated by a Technical Evaluation Committee, composed of Department officials, on the basis of a number of technical factors, including qualifications of technical personnel, prior corporate experience, and technical approach. In its evaluation of the initial submissions, the committee also would determine the areas where the bid could be made “more competitive” and improved through negotiations. The initial business proposal,
 
 i.e.,
 
 the cost of the contract, was to be evaluated by the contracting officer.
 

 The proposal provided that the contracting officer would award the contract on the basis of a weighted formula, under which 70 percent of the total was based upon the score of the technical portion of the bid and the remaining 30 percent was based upon the estimated cost.
 

 In response to the proposal, eight firms submitted bids, including CACI and the apparently successful bidder, Sterling Systems, Inc. (Sterling). Most of the allegations of impropriety in this case are based upon relationships between Antitrust Division employees in the group who participated in the bid evaluation process and Robert L. Stevens, the chief of the Group from 1978 to 1980, who, as Sterling’s vice president, directed the preparation of Sterling’s bid and represented the company before the Department during its consideration of the bids.
 

 The Technical Evaluation Committee had five members. The chairman was Carl E. Anderson, a section chief in the Group. The other members were Terence A. Sweeney, Stevens’ successor as chief of the Group; Patricia J. Shelton, another section chief in the Group; Durwin E. Smith, an employee in the Group; and Thomas E. Powers, an employee in the Department’s Management Division, an office that oversees the Departmental procurement. Powers was the only member of the committee who did not have some prior social or professional relationship with Stevens.
 

 
 *1571
 
 Anderson had worked either directly or indirectly for Stevens since 1971, in both the government and the private sector. Sweeney had worked under and reported directly to Stevens at the Group, and his professional association with Stevens began in 1978. Shelton also worked under Stevens during the latter’s tenure at the Group. Smith had a social relationship with Stevens.
 

 The contracting officer for this procurement was Ronald L. Endicott, an employee of another division of the Department. As the trial judge stated, “[tjhere is no evidence of any prior professional or social relationship between him and Stevens.” Endicott was directly involved in all phases of the bid process, and “selected and named the Chair and members of the Technical Evaluation [Committee] .... ”
 

 In its consideration of the initial bids, the Technical Evaluation Committee evaluated the technical aspects of each proposed contract on a 100-point scoring system. It ranked CACI’s bid first at 85.2 and Sterling’s second at 79. In scoring the bids, the committee was not shown the cost estimate portion of the bids. After the committee reported these scores to the contracting officer, the latter then evaluated the costs of each bid with the assistance of Anderson, the chairman of the committee.
 

 The contracting officer, Anderson, and Sweeney then met with representatives of each of the six bidders whose proposals were deemed to be in the “competitive range,”
 
 i.e.,
 
 that could be made competitive through negotiation. The contracting officer required the bidders to limit their discussions “as much as possible” to “the weaknesses of their [bids] and where the [bids] could be made more competitive.”
 

 After these negotiation sessions, each of the six bidders submitted its “best and final offer.” Again, the technical and cost portions of the proposals were separated. The Department followed the same procedures in reviewing the final offers that it followed in reviewing the initial submissions.
 

 In their initial submissions, Sterling and another firm, Infodata, each had submitted a proposal in which the other was a subcontractor. At the negotiating sessions, the government’s representatives pointed out that elimination of subcontractors could reduce costs. In its final submission, Sterling submitted two best and final offers, both responsive to the proposal. One of Sterling’s proposals included Infodata as a subcontractor. The other offer was
 
 for
 
 a “stand-alone” proposal, which Sterling would staff and perform itself. No other bidder submitted two proposals.
 

 The Technical Evaluation Committee. ranked the technical aspects of CACI’s final bid the highest, with a score of 87.4. Sterling’s teaming proposal with Infodata was ranked second (84.6), and its stand-alone proposal ranked third (84). The other four final bidders were ranked significantly lower (i.e., from 75.8 to 64.6 points). Virtually all the bidders received higher scores on their final proposals than they had received on their initial submissions. Sterling’s score was increased more than CACI’s. Once again, the committee was not told the cost estimates in the final offers.
 

 The committee reported these scores to the contracting officer, who again, with Anderson’s assistance, evaluated and graded the final cost proposals. Then, using the weighted formula described above, the contracting officer determined that Sterling’s separate, unteamed bid had the highest overall score. Although Sterling’s technical score was below CACI’s, Sterling had a higher overall rating because its projected costs were significantly lower than CACI’s.
 

 Before any award was made, CACI filed a protest with the General Accounting Office alleging a conflict of interest by the four persons in the Group involved in the bid process who had prior associations with Stevens. It notified the contracting officer of the protest. On December 22, 1982, while the complaint was pending, Sweeney met with Stevens to formulate “transition plans” in connection with the anticipated award of the contract to Sterling.
 

 After the Justice Department informed CACI that the Department would not defer the award pending the protest, CACI filed suit in the Claims Court on January 3, 1983.
 
 *1572
 
 It sought a declaratory judgment that an award of the contract would be contrary to applicable law and to “the public interest in the integrity of the Federal procurement system,” and injunctions (both preliminary and permanent) against the award.
 

 B. Following an expedited trial at which 16 witnesses testified and a number of exhibits were introduced in evidence, the Claims Court (Judge Spector) permanently enjoined the award of the contract to Sterling. The court first held that CACI, as an unsuccessful bidder, had standing to challenge the proposed award. On the merits, the court concluded that “there would be no rational nor reasonable basis for awarding a contract to Sterling on the facts of record in this ease, and such an award would be, moreover, arbitrary, capricious and an abuse of discretion.” In a footnote to this statement, the court added that “[i]t is not necessary in this proceeding to determine whether such an award would also be illegal.”
 

 The court stated that
 

 Aside from the “appearance of evil” throughout that record, there are a number of instances in which Stevens’ prior service as Chief of ISSG [the Group], and his long-standing and continuing professional and social relationships with his successor, and with all but one of the 5-member Technical Evaluation Board ripened into concrete manifestations of prejudice in favor of Stevens’ company, and against plaintiff and others.
 

 The court further stated that “[t]he record is replete with instances where Stevens and his former associates at ISSG exceeded the bounds of propriety and thus created at least the appearances of and the opportunity for impropriety .... ”
 

 II
 

 The government argues that CACI as an unsuccessful bidder has no standing to challenge the proposed award of the contract to Sterling. It contends primarily that CACI is not within the “zone of interests,”
 
 Association of Data Processing Service Organizations, Inc. v. Camp,
 
 397 U.S. 150, 152-53, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970), that the statutory provisions that CACI alleges the government violated (discussed on pp. 17 — 25,
 
 infra)
 
 were designed to protect. The government also argues that CACI has not shown that “the challenged action has caused [it] injury in fact,” 397 U.S. at 152, 90 S.Ct. at 829, since it cannot demonstrate that if the conduct it challenges had not taken place it would have been awarded the contract. These arguments reflect a misconception of the basis of the Claims Court’s jurisdiction and a misinterpretation of the legislative history of the statute that gave the Claims Court jurisdiction over suits seeking injunctive relief against the award of government contracts.
 

 A. Prior to 1970, an unsuccessful bidder generally had no standing to challenge the award of the contract.
 
 See Perkins v. Luk-ens Steel Co.,
 
 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940);
 
 Edelman v. Federal Housing Administration,
 
 382 F.2d 594, 597 (2d Cir.1967). The theory of those decisions was that the various statutes and regulations governing the award of government contracts were not intended to protect bidders on those contracts but only to protect the government, and that violation of those provisions therefore did not violate any legally protected rights of unsuccessful bidders.
 
 Id.
 

 In the seminal case of
 
 Scanwell Laboratories, Inc. v. Shaffer,
 
 424 F.2d 859 (D.C.Cir. 1970), however, the court held that under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1982), a disappointed bidder had standing to challenge the award of a government'contract. The court stated that unsuccessful bidders “are the people who will really have the incentive to bring suit” to compel “agencies [to] follow the regulations which control government contracting” and that “[t]he public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity .... ” 424 F.2d at 864.
 

 The jurisdiction of the Claims Court over suits challenging the award of contracts for
 
 *1573
 
 alleged impropriety in the contracting process rests upon the Tucker Act grant of jurisdiction to that court over “any claim against the United States founded ... upon any express or implied contract with the United States 28 U.S.C. § 1491(a) (1982). The basis of such suits is a violation of “an implied contract to have the involved bids fairly and honestly considered.”
 
 United States v. John C. Grimberg Co.,
 
 702 F.2d 1362, 1367 (Fed.Cir.1983). The court there referred to the decision of our predecessor court, the Court of Claims, in
 
 Keco Industries v. United States,
 
 428 F.2d 1233 (Ct.Cl.1970), which had recognized the standing of an unsuccessful bidder to sue the United States for its bid preparation costs.
 

 In
 
 Keco,
 
 the Court of Claims stated that “as a result of
 
 Scanwell
 
 a party, who can make a prima facie showing of arbitrary and capricious action on the part of the Government in the handling of a bid situation, does have standing to sue.. . . [Ejvery bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, then the injured party has the right to come into court and try. and prove his cause of action.”
 
 Id.
 
 at 1237. “[B]y the solicitation for bids, the Government impliedly promised that it would give honest and fair consideration to all bids received and would not reject any one of them arbitrarily or capriciously, but would award the contract to that bidder whose bid in its honest judgment was most advantageous to the Government.”
 
 Heyer Products Co.
 
 v.
 
 United States,
 
 177 F.Supp. 251, 252 (Ct.Cl.1959);
 
 see also B.K. Instrument, Inc. v. United States,
 
 715 F.2d 713 (2d Cir.1983);
 
 Heyer Products Co. v. United States,
 
 140 F.Supp. 409, 412-13 (Ct.Cl.1956).
 

 Thus, CACI brought the present suit to enjoin the government’s alleged breach of its implied contract to consider all bids fairly and honestly. As the Court of Claims explained in
 
 Heyer,
 
 “[t]his implied contract has been broken, and plaintiff may maintain an action ... for its breach” where the “bids were not invited in good faith, but as a pretense to conceal the purpose to let the contract to some favorite bidder ... and with the intent to willfully, capriciously, and arbitrarily disregard the obligation to let the contract to him whose bid was most advantageous to the Government.” 140 F.Supp. at 413, 414;
 
 see also Keco,
 
 428 F.2d at 1236.
 

 In Section 133(a) of the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25, 39-40 (1982), Congress amended the Tucker Act to give the Claims Court the following additional authority:
 

 (3) To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.
 

 The legislative history of this provision shows that Congress intended the Claims Court to have the same authority over suits by unsuccessful bidders (brought before the contract was awarded,
 
 Grimberg,
 
 702 F.2d at 1369) that the district courts had under
 
 Scanwell.
 
 The Senate Committee Report explained:
 

 By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically, the Scan-well doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left in tact [sic].
 
 See Scanwell Laboratories, Inc. v. Shaffer,
 
 424 F.2d 859 (D.C.Cir. 1970).
 

 S.Rep. No. 275, 97th Cong., 2d Sess. 23 (1981),
 
 reprinted in
 
 1982 U.S.Code Cong. & Ad.News 11, 33.
 

 The House Committee Report stated: “It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action.
 
 See, e.g., Scanwell Laboratories, Inc. v. Shaffer,
 
 424 F.2d 859 (D.C.Cir. 1970).” H.R.Rep. No. 312, 97th Cong., 1st Sess. 43 (1981).
 

 
 *1574
 
 The essence of “the Scanwell doctrine,” which Congress intended 28 U.S.C. § 1491(a)(3) to make applicable to the Claims Court, is that an unsuccessful bidder has standing to challenge a proposed contract award on the ground that in awarding the contract the government violated statutory and procedural requirements. That is precisely the basis upon which CACI here challenges the proposed award to Sterling. To deny CACI standing to litigate this question before the Claims Court would vitiate the jurisdiction Congress gave that court over such suits in the Federal Courts Improvement Act.
 

 B. 1. The government argues, however, that in
 
 Data Processing
 
 the Supreme Court modified the
 
 Scanwell
 
 doctrine by requiring as a condition of standing that “the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” 397 U.S. at 153, 90 S.Ct. at 830. It contends that under this standard CACI had no standing because the statutory provisions and regulations that CACI asserts the government violated were not intended to protect bidders but only to protect the government.
 

 Data Processing
 
 was a suit by data processing companies directly challenging, as violating the governing statute, a ruling of the Comptroller of the Currency permitting national banks to provide data processing services. The question on the merits was whether the statute authorized the banks to provide such services. The plaintiffs asserted standing as competitors of the banks in providing the services. The injury about which the plaintiffs complained was the direct result of the Comptroller’s alleged violation of the statute, and the standing issue turned upon whether the statute was intended to protect them against such injury-
 

 The present suit, in contrast, is based upon the Department of Justice’s alleged breach of its implied contractual obligation to consider CACI’s bid fairly and honestly. The government’s alleged violations of statutes and regulations are not directly challenged as such but instead are relied upon to show a violation of the contractual duty. See
 
 Keco Industries v. United States,
 
 492 F.2d 1200 (Ct.Cl.1974) (violations of statutes or regulations considered as factors relevant to determining whether the government has breached its implied contract);
 
 Heyer Products Co. v. United States,
 
 177 F.Supp. 251, 252 (Ct.Cl.1959). The only persons injured by the government’s violation of that duty would be the unsuccessful bidders, and they have standing to challenge that alleged breach of contract. The theory upon which the Claims Court has jurisdiction under the Tucker Act over such cases necessarily requires that the unsuccessful bidders be able to challenge the award. Indeed, normally they would be the only persons able to do so.
 

 2. The government also argues that CACI has not met the additional requirement for standing announced in
 
 Data Processing
 
 that “the challenged action has caused it injury in fact, economic or otherwise.” 397 U.S. at 152, 90 S.Ct. at 829. In its brief the government asserts that “[e]ven assuming that plaintiff could prove a violation of law, it has not alleged and cannot demonstrate that, but for that violation, it would have been the successful of-feror under the [proposal],” and that injunc-tive relief would not cure the alleged injury because it would not result in CACI receiving the award.
 
 See, e.g., Simon v. Eastern Kentucky Welfare Rights Organization,
 
 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).
 

 The Court of Claims has rejected a similar argument of the government that a disappointed bidder “must show that, but for the failure to consider its proposal, it would have received a contract.”
 
 Morgan Business Associates v. United States,
 
 619 F.2d 892, 895 (Ct.Cl.1980). As the Court of Claims there indicated, “it would be virtually impossible for the plaintiff to make a ‘but for’ showing.” 619 F.2d at 896. It held that the disappointed bidder need demonstrate only that if its bid had been fairly and honestly considered, “there was a substantial chance that [it] would receive an award — that it was within the zone of ac
 
 *1575
 
 tive consideration.”
 
 Id.
 
 This “principle of liability” both “vindicates the bidder’s interest and right in having his bid considered” and “at the same time forestalls] a windfall recovery for a bidder who was not in reality damaged.”
 

 The flaw in the government’s argument here is that it misconceives the nature of the injury that unsuccessful bidders seek to rectify in bid protest suits.
 
 Scanwell
 
 itself recognized that a disappointed bidder has “no right ... to have the contract awarded to it in the event the ... court finds illegality in the award of the contract .... ” 424 F.2d at 864. The injury CACI here asserts is that the government’s breach of its implied contract to deal fairly with all bidders denied CACI the opportunity to have its bid considered solely on its merits. An injunction barring the award would correct this alleged injury since it would require the government, if it wants to go ahead with the procurement, to repeat the bidding process under circumstances that would eliminate the alleged taint of the prior proceedings.
 

 CACI was within the “zone of active consideration” for the award of the contract. It was one of the six companies that qualified to submit a best and final offer, and its score on the offer placed it second only to Sterling. It has standing to challenge the proposed award to Sterling.
 

 Ill
 

 The precise grounds upon which the Claims Court enjoined the award of the contract to Sterling are unclear. The court quoted from and discussed sections 207 and 208 of the Ethics in Government Act, but did not hold that the Department had violated either of those provisions. The rationale of its decision appears to be that the relationships between Stevens of Sterling and Sweeney, Anderson, Shelton, and Smith of the Group, all four of whom were members of the Technical Evaluation Committee, created a sufficient opportunity for and appearance of impropriety that the award of the contract pursuant to the procedures in which these four people participated would be “arbitrary, capricious and an abuse of discretion,” and that for these reasons the award of the contract should be permanently enjoined. In supporting the decision of the Claims Court, however, CACI argues that there were violations of sections 207 and 208.
 

 We conclude (A) that sections 207 and 208 were not violated; (B) that the record does not establish actual bias or favoritism toward Sterling by Sweeney, Anderson, Shelton, or Smith, or any impropriety in the award of the contract to Sterling because of their participation in the award process; and (C) that there was no appearance of or opportunity for impropriety that would warrant enjoining the award of the contract on the ground that the Department breached its implied contractual obligation to treat all bidders fairly and honestly.
 

 A. 1. Section 207 of the Ethics in Government Act prohibits any government employee “after his employment has ceased” from
 

 knowingly act[ing] as agent ... for, or otherwise representing], any other person ... in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person ... to—
 

 (1) any department ... of the United States ... or any officer or employee thereof, and
 

 (2) in connection with any ... application, ... contract, claim, ... or other particular matter involving a specific party or parties in which the United States ... has a direct and substantial interest, and
 

 (3) in which he participated personally and substantially as an officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise, while so employed ....
 

 18 U.S.C. § 207 (Supp. V 1981).
 

 CACI contends that Stevens’ participation on behalf of Sterling in the preparation and presentation of Sterling’s bid violated this provision because Stevens had worked on this procurement during his prior employment at the Group, through his involve
 
 *1576
 
 ment in developing the request and administering the earlier sole-source contracts by which the Antitrust Division had obtained litigation support services.
 

 For section 207 to have barred Stevens from acting on behalf of Sterling in formulating and presenting its response to the proposal to the Antitrust Division, the proposal must have been the same “particular matter” in which Stevens “participated personally and substantially” while he was the chief of the Group between 1978 and 1980. The Claims Court found that the prior data processing contracts, in the administration of which Stevens was involved as chief of the Group, and the current “procurement [are] part of the same ‘particular matter.’ ” It stated that “[although somewhat different in form, the proposed contract is essentially a follow-on to the type of continuing automatic data processing and litigation support services procured during Stevens’ tenure at [the Justice Department] and thereafter.” The record does not support these findings.
 

 In August 1981, Sterling inquired by letter to the Department about the applicability of section 207 and the Department’s implementing regulations to Stevens’ participation in the proposal on behalf of Sterling. In response, William F. Baxter, the Assistant Attorney General in charge of the Antitrust Division, advised Stevens by letter in May of 1981 that:
 

 Mr. Stevens would be qualified to manage Sterling’s proposal activities, represent Sterling with respect to the RFP [proposal] and manage Sterling’s performance on any resulting contract for at least two reasons: (1) the program covered by the RFP did not involve any specific party or parties while Mr. Stevens was employed by the Division, and (2) the RFP to be issued does not involve the “same particular matter” as anything with which Mr. Stevens was involved as a Government employee. Specifically, the Antitrust Division’s 1978 Litigation Support RFP and our new one will not be the “same particular matter” because of (a) time elapsed between them, and (b) fundamental differences in their scope and approach.
 

 This ruling is entitled to weight. It would be most unusual to disqualify Sterling from bidding on the proposal because of Stevens’ participation for Sterling after the Assistant Attorney General in charge of the Antitrust Division had advised Sterling that Stevens’ handling of the proposal for Sterling would not be improper.
 

 The record shows that the present proposal was not the “same particular matter” with which Stevens was involved while chief of the' Group. Although Stevens “contemplated” competitive reprocurement of the services CACI and others were supplying under the sole-source contracts, he played no role “whatsoever” in either developing the baseline services concept or “in the formulation of the [proposal]” for bids on it. Sweeney, not Stevens, originated and developed both of these ideas, and did so after Stevens had left the Group in December 1980 and Sweeney had succeeded him as its head. Sweeney testified that he developed the idea for the baseline service contract, which he characterized as “basically my own,” in approximately the spring and summer of 1981.
 

 The baseline service contract which the proposal covers is broader in scope, different in concept, and incorporates different features than the prior contracts. Sweeney, the chief of the Group, stated that the service to be provided under the new contract “far exceeds” the service under the existing contracts. He explained that the “broad objective” of the new contract is to consolidate several services currently provided by four different firms into a single contract, to eliminate redundant services, improve management control, and provide new services to the Department. The contract will include some services provided under the old contract as well as new services
 
 (i.e.,
 
 production control activities), and will also exclude certain services provided under the old contracts.
 

 2. Section 208 of the Ethics in Government Act prohibits a person from “partici-pat[ing] personally and substantially as a Government officer or. employee, through decision, approval, disapproval, recommen
 
 *1577
 
 dation, the rendering of advice, investigation, or otherwise, in a ... contract ... or other particular matter in which, to his knowledge, he ... or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest ... . ” 18 U.S.C. § 208 (Supp. V 1981).
 

 CACI contends that Anderson and Shelton, two of the Department officials involved in the evaluation of the Sterling bid, violated this provision because they negotiated with and had offers of employment from Sterling.
 

 The Claims Court found that Anderson and Shelton received “employment offers conditioned in part on [Stevens’] success in receiving additional contracts.” It stated that “Stevens had from a time prior to his departure from ISSG, to a time prior to the issuance of this [proposal], discussed with Anderson the possibility of their working together at Sterling,” and that there was “some evidence of a lesser effort by Stevens to recruit Patricia Shelton ... for work at Sterling.”
 

 Our review of the record leads us to conclude that there was no “arrangement concerning prospective employment” between either Anderson or Shelton and Sterling, and that these individuals were not “negotiating” with Sterling about prospective employment when they considered Sterling’s bid.
 

 a. Anderson testified that he had “discussions” with Stevens in April of 1981, after Stevens had left the Department. Stevens “talked about positions that might be available in the division that he was going to head within Sterling Systems.” Anderson stated that Stevens “never made me any specific offer or any firm offer for employment at Sterling .. .. ” No discussions of salary took place. In their last discussion, Anderson remembers believing that “there would be a further discussion” and that the matter was left “sort of hanging.” He testified that Stevens told him “he had hoped to have positions available in the future, but right now he had nothing he could offer me, and I sort of anticipated some future contact from Mr. Stevens.”
 

 The last pertinent contact with Stevens that Anderson recalled was an April 1981 phone call in which Stevens “indicated that things were going much slower than what he anticipated and that he couldn’t foresee having a position in the near future,”
 
 i.e.,
 
 “within seven months.” Anderson had no further discussions with Stevens concerning employment after that time.
 

 Stevens’ testimony was in accord with Anderson’s. He recalled a conversation with Anderson prior to leaving the Department “about the possibility of him joining me.” He stated that since “there was no specific job” in existence, they “discussed the possibility of future employment,” namely, that Anderson might work on a government contract Sterling anticipated obtaining.
 

 Sterling never obtained that contract. Stevens testified that after he left the government, Anderson “was promoted and his salary at that point was ... above the rates that I was able to compete with or use him on contracts .... ” Stevens also testified that Sterling received “a significant contract” which was staffed “with other people,” and that one of these positions was “the position that we had talked about.”
 

 When asked if he ever offered Anderson a job, Stevens replied, “No, I never talked to him specifically about a salary or a start time or any of that nature.”
 

 A CACI employee testified that Anderson mentioned to her that “Stevens had made him an offer from Sterling ...” but that “the offer .. . had been withdrawn.” Another CACI employee indicated that Anderson told him “that he might be leaving [the Group] and in fact he had talked to .. . Stevens and he was going to be going to work for Sterling in the next couple of months.” These conversations occurred in either the spring or summer of 1981, with the witnesses unable to pinpoint specific dates.
 

 Stevens had similar discussions about possible employment with Shelton. Shelton testified that in March or April of 1981, they had “some discussions about the possibility of my moving to Sterling Systems at
 
 *1578
 
 some point.” No specific position or salary was discussed. After that time, there were no additional discussions about employment.
 

 Stevens testified that after he staffed a contract using personnel within the company, that “terminated any possibility of discussion with Pat [Shelton].” He also stated that although he had a specific job in mind for Shelton on another contract then under consideration, “the job did not materialize” because the contract was not awarded.
 

 This evidence does not establish that either Anderson or Shelton had an “arrangement” concerning prospective employment with Sterling.
 

 b. Anderson and Shelton were not “negotiating” with Stevens about prospective employment at Sterling. Their discussions were only preliminary exploratory talks, directed to possibilities that never materialized, not negotiations.
 

 Moreover, these discussions occurred long before the Department issued the proposal for bids. The discussions all ended in April 1981. The Department issued the proposal on September 3,1982, more than 16 months later. The bids were not due until October 4, 1982. The Technical Advisory Committee, of which Anderson and Shelton were members, considered the various offers after that date. By that time any discussions by Anderson and Shelton with Stevens about prospective employment had long since ceased and they were not then “negotiating” with him about that subject.
 

 Section 208 prohibits the participation by a government official only in a decision or matter (i.e., a contract award) in which he or “any person or organization with whom he
 
 is
 
 negotiating or
 
 has
 
 any arrangement concerning prospective employment,
 
 has
 
 a financial interest .... ” 18 U.S.C. § 208 (Supp. V 1981) (emphasis added);
 
 see also
 
 5. Rep. No. 2213, 87th Cong., 2d Sess. 13,
 
 reprinted in
 
 1962 U.S.Code Cong. & Ad. News 3852, 3862: “The disqualification of the [section] embraces any participation on behalf of the Government in a matter in which the employee
 
 has
 
 an outside financial interest .... ” (emphasis added).
 

 The statute does not bar government employees from participating in con-tract discussions, negotiations, or evaluations merely because, at an earlier time, they had some general discussions with some of the bidders about possible employment. Government officials often are approached about possible private employment. To bar them from participation months later in decisions involving a company that raised the possibility could cause serious problems for the effective functioning of the government. As the Senate Committee Report on the Ethics in Government Act explained: “Conflict of interest standards must be balanced with the government’s objective in attracting experienced and qualified persons to public service .... There can be no doubt that overly stringent restrictions have a decidedly adverse impact on the government’s ability to attract and retain able and experienced persons in federal office.” S.Rep. No. 170, 95th Cong., 2d Sess. 32 (1977),
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 4216, 4248.
 

 B. Our review of the record discloses no evidence that the Department officials who had prior professional and social contact with Stevens in fact were biased toward or did anything that improperly favored his company, Sterling.
 

 1. Contrary to CACI’s contention, the proposal was not structured to favor Sterling over its competitors. Indeed, it was CACI, and not Sterling, that received the highest evaluation of its final technical offer.
 

 CACI complains that the cost-plus-fixed-fee type of contract used here prejudiced it because, unlike Sterling and other bidders who had not had prior data processing service contracts with the Department, CACI’s estimated costs were required to reflect its prior actual costs and therefore it could not understate its costs in preparing its bid. The notion that a contractor has a right to understate its costs in a bid submitted to the government and therefore is prejudiced if it cannot do so is not a valid basis for criticizing the use of the cost-plus-fixed-fee contract. There is no convincing evidence that any of the other bidders, including Sterling, in fact intentionally un
 
 *1579
 
 derestimated their costs. To the contrary, each bidder “was asked to certify his cost and pricing data, in accordance with public law.”
 

 CACI has not demonstrated that the Department’s use of the cost-plus-fixed-fee contract was intended to or did favor Sterling over CACI and the other competing bidders. Sweeney, the chief of the Group, explained that one of the reasons this type of contract was selected was because of the impossibility of predicting the amount of work under the baseline contract.
 

 2. The Claims Court suggested that the anticipated award to Sterling was arbitrary because “[c]osts and price are given an inordinate weight [30 percent] in the overall evaluation of proposals, although actual costs cannot be known in a contract of this type, and cost estimates are inexact and illusory.” It stated that “[t]he estimates in the [bids] bear little relationship to the actual workload which subsequently develops,” and that “[t]he number of hours required to perform a particular service will vary with the skill and efficiency of a particular contractor’s personnel, and is therefore unpredictable.”
 

 The record provides no valid basis for criticizing or rejecting the formula by which the Department weighted the bids. Sweeney testified that in this type of service contract, the most important factor is the caliber of the people who will do the work, and that this was the reason the technical aspects of the contract were given the most weight. He stated that the 70-30 allocation “struck a fair balance, as fair as we could possibly come up with in a competitive situation, between those two competing factors.” The record indicates that the information in the bid showing how the contract will be performed (f.e., names and resumes of personnel who would do the work) enabled the government to make a meaningful evaluation of each bid’s cost estimates.
 

 When the Department selected the 70-30 weighted formula, no one could have anticipated what the bids would be. It borders on the bizarre to suggest, as CACI apparently does, that the Department officials who allegedly favored Sterling anticipated that Sterling would be ranked second or lower on its technical proposal so that it could obtain the contract only if its costs, which for some unknown reason would be lower, were given substantial weight.
 

 3. The fact that Anderson, the head of the Technical Evaluation Committee, assisted the contracting officer Endieott in evaluating the bids, and therefore saw the cost portions of the bids, did not taint the award process. The contracting officer testified that using a member of the Technical Evaluation Committee to assist in evaluating the cost proposals was a standard practice he had “followed and .. . observed” during his 15 years’ experience. He stated that Anderson’s technical knowledge was useful in determining whether the cost proposals were realistic and in finding ways to reduce these costs.
 

 4. The Department’s acceptance of the two final bids Sterling submitted— one separately, and one with Infodata as a
 
 subcontractor
 
 — was not improper.
 

 Neither the original proposal, the request for best and final offers, nor any regulation brought to our attention explicitly bars the submission of more than one proposal by a contractor. The Technical Evaluation Committee discussed Sterling’s submission of two final offers, and “determined that in the best interest of the government, each proposal should be evaluated separately and assigned a final ranking.” Anderson discussed the submission of two bids by Sterling with the contracting officer, who indicated that “we could evaluate both technical proposals.” There is no evidence that the Department’s decision to accept both proposals was arbitrary or reflected a bias toward Sterling.
 

 CACI also contends that the record justifies the inference that during the negotiating sessions Department officials improperly informed Stevens of other parties’ cost proposals or suggested that Sterling could submit two best and final offers. The record did not support these charges of impropriety.
 

 
 *1580
 
 There is nothing in the record that even suggests that Department officials told Stevens what the other bidders’ costs were. The record shows that Anderson saw the initial and final cost figures, and that he saw the initial cost figures after the Technical Evaluation Committee “had completed the technical evaluation of the initial proposals.” There is no indication that the circumstances under which he saw the final cost figures were any different. Indeed, since the record shows that the contracting officer informed Anderson about the cost figures in connection with their analysis and evaluation of those figures after the Technical Evaluation Committee had evaluated the technical proposals, there is no factual basis for CACI’s suggestion that Anderson communicated the cost figures to the Committee before the Committee rated the technical proposals.
 

 Although Sweeney testified that Anderson had communicated to him the “relative scores” on the initial cost proposals, he further testified that this information did not enable Sweeney to predict the ultimate outcome of the bidding. As Sweeney stated: “I thought I knew who was going to win after best and final, and I was wrong.” He had anticipated that “someone other than Sterling was going to be the lowest.”
 

 With respect to Stevens’ submission of the two bids, the record shows that during the negotiating sessions after the first offers had been submitted, the contracting officer told Stevens that “the Infodata personnel ... in our original submission were not up to the standards of the Sterling personnel and that we should seek an alternate personnel for two positions,” and that the costs of the subcontract arrangement with Infodata seemed “too high.” Stevens stated that in its best and final offer Sterling “tried to obtain better rates from Info-data and alternate personnel.” Although Infodata provided alternate personnel, it changed its rates only “very slightly.” As a result, Sterling submitted an alternative bid in which it filled several positions “with Sterling personnel at a significant savings in cost.” There was nothing improper in Sterling’s doing so — although it took the risk that the Department might deem two bids unresponsive and reject both of them— or in the Department considering both of them.
 

 5. The Claims Court stressed that three members of the Technical Evaluation Committee who had prior relationships with Stevens (Shelton, Anderson, and Smith) made “large” increases in Sterling’s scores on its two final technical proposals over Sterling’s scores on its initial bids, and that Powers, the only committee member with no prior relationship with Stevens, decreased Sterling’s stand-alone score and increased its teamed proposal with Infodata by a smaller amount than the other three.
 

 Once again, these facts do not show favoritism toward Sterling. The scores of all the bidders who submitted best and final offers were increased. Shelton, Anderson, and Smith also increased CACI’s score, although not by as much as they increased Sterling’s score. Although Sterling’s increase was greater than CACI’s, CACI still received the highest score on its technical proposal. It was only after Sterling’s lower costs were taken into account — and the record shows that the Technical Evaluation Committee had not been informed of the final cost figures when it rated the final technical proposals — that Sterling appeared to be the successful bidder.
 

 6. Finally, the Claims Court and CACI see something sinister in the fact that Sweeney met with Stevens to discuss implementing the contract even though CACI had filed with the Comptroller General a protest over the anticipated award to Sterling. At that time, however, Sterling had been preliminarily selected as the contractor. Since the Department was anxious for performance of the new contract to begin as soon as possible, it was not surprising or inappropriate for the Department to hold preliminary discussions with the apparently successful bidder. The contracting officer had authorized the meeting, which neither
 
 *1581
 
 involved any impropriety nor reflected any bias toward Sterling.
 

 C. A major thrust of the decision of the Claims Court was that there was both the opportunity for and the appearance of impropriety in that process. That was not an adequate or proper basis for enjoining the award of the contract to Sterling.
 

 The Claims Court referred to an Office of Personnel Management regulation that states:
 

 An employee shall avoid any action, whether or not specifically prohibited by this subpart, which might result in or create the appearance of:
 

 jjc sf: sjs
 
 %
 
 £
 

 (b) Giving preferential treatment to any person;
 

 * * * * * *
 

 (d) Losing complete independence ,or impartiality;
 

 ... or
 

 (f) Affecting adversely the confidence of the public in the integrity of the Government.
 

 5 C.F.R. § 735.201a (1982).
 

 This regulation merely provides general standards to guide government employees in the performance of their duties. It does not create specific and precise standards, the violation of which would justify enjoining the Department from awarding a contract.
 

 In explaining the jurisdiction of the Claims Court under 28 U.S.C. § 1491(a)(3) to grant injunctive and declaratory relief, the House Committee stated that it “expects that the Court will utilize the authority conferred upon it by this section only in truly extraordinary circumstances .... ” H.R.Rep. No. 312, 97th Cong., 1st Sess. 44 (1981). Similarly, Senator Dole, the floor manager of the bill, in discussing this provision on the floor of the Senate, pointed out that
 

 the Government must be permitted to exercise its right to conduct business with those suppliers it selects and to do so in an expeditious manner.
 

 The courts ordinarily refrain from interference with the procurement process by declining to enjoin the Government from awarding a contract to a contractor which the Government has selected.
 

 127 Cong.Rec. S14694 (daily ed. December 8, 1981).
 

 As this court stated in
 
 Grimberg,
 
 “injunc-tive relief [is] awardable ... only in extremely limited circumstances.” 702 F.2d at 1372.
 

 The Claims Court also relied upon language in
 
 United States
 
 v.
 
 Mississippi Valley Generating Co.,
 
 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), that described the public purposes of a predecessor to the Ethics in Government Act. The suit there was brought by a contractor to recover the amount it had expended under a government contract the government had can-celled. The government’s primary defense was that “the contract was unenforceable due to an illegal conflict of interest on the part of” a government employee. 364 U.S. at 524, 81 S.Ct. at 296. The Court held that the government could “disaffirm a contract which is infected by an illegal conflict of interest.” 364 U.S. at 566, 81 S.Ct. at 317.
 

 That holding, however, rested solely on the Court’s conclusion that the government employee had violated the conflict of interest statute. In the present case, in contrast, there has been no violation of the Ethics in Government Act. The broad language in
 
 Mississippi Valley
 
 cannot properly be applied to the significantly different situation in the present case.
 

 We have carefully reviewed the record in this case. We conclude that the Claims Court ruling that the Department’s award of the contract to Sterling would be “arbitrary, capricious, and an abuse of discretion” because of the possibility and appearance of impropriety is not supported by
 
 *1582
 
 the record and therefore is not a proper basis for enjoining award of the contract. The Claims Court based its inferences of actual or potential wrongdoing by the Department on suspicion and innuendo, not on hard facts. The kind of inquiry and analysis the Claims Court made in this case, which without factual basis ascribed evil motives to four members of the Technical Evaluation Committee in their handling of bids, was clearly erroneous and did not justify an injunction against the government’s award of the contract to Sterling.
 

 The judgment of the United States Claims Court permanently enjoining the award of the contract to Sterling Systems, Inc., is reversed, and the case is remanded to that court with instructions to dismiss the complaint with prejudice.
 

 REVERSED AND REMANDED.