**PARCEL 49C LIMITED PARTNERSHIP,**
Plaintiff–Appellee,

v.

**The UNITED STATES, Defendant–Appellant.**

No. 94–5085.

United States Court of Appeals,
Federal Circuit.

Aug. 1, 1994.

Richard J. Conway, Dickstein, Shapiro & Morin, Washington, DC, argued for plaintiff-appellee.

Donald E. Kinner, Atty., U.S. Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Robert E. Kirschman, Jr. Of counsel were Sharon Roach, Atty., General Services Admin. and Jane Mago, Atty., F.C.C.

Before ARCHER, Chief Judge, COWEN, Senior Circuit Judge, RADER, Circuit Judge.

RADER, Circuit Judge.

After selecting Parcel 49C Limited Partnership, the General Services Administration (GSA) cancelled a solicitation for a new Federal Communications Commission (FCC) headquarters building. The United States Court of Federal Claims enjoined GSA's cancellation. *Parcel 49C Limited Partnership v. United States,* No. 92–286C (Fed.Cl. Mar. 14, 1994). The trial court determined that GSA violated its duty to consider fairly all responsive bids. This court affirms that determination. Additionally, with modification of the relevant dates, this court upholds the trial court's order reinstating the improperly cancelled solicitation.

## BACKGROUND

In September 1987, GSA obtained authority to issue Solicitation for Offers (SFO) 88–100. SFO 88–100, which issued in March 1989, sought building space to consolidate FCC headquarters. As amended, SFO 88–100 required a minimum of 286,500 square feet and a maximum of 305,000 square feet of

space. The solicitation contained an option for 30,000 additional square feet pending approval from Congress. SFO 88–100 specified that the building must be ready for initial occupancy no later than January 1993 and complete occupancy no later than July 1993.

In February 1990, FCC asked GSA to cancel SFO 88–100 and revise the delineated area for relocation. FCC sought to revise the relocation area to remain "in close proximity" with "the offices of the communications industry representatives." FCC's current headquarters lie in the northwest quadrant of Washington, D.C., amidst a fashionable business district. The revised area would have excluded Parcel 49C's proposed consolidation site in the southwest quadrant of the nation's capital. GSA declined to revise the solicitation.

In September 1991, GSA issued its request for best and final offers (BAFOs). GSA received four BAFOs. Parcel 49C and Warner Theatre Associates were the leading contenders. The Warner Theatre building lies in the northwest quadrant near Pennsylvania Avenue, within the revised area requested by FCC. Far East Trading, Inc., an offeror that submitted a nonresponsive offer, protested to General Accounting Office (GAO) that SFO 88–100's January 1993 occupancy date was too restrictive. GAO conducted protest proceedings during which FCC stressed the importance of the occupancy date.

The Court of Federal Claims made revelatory findings about the procurement process:

> The source selection process was marred by disagreement between GSA and FCC over how offers should be evaluated. The source selection was to be based on who could provide the Government with the greatest value, while FCC wanted an award to go to the offeror that FCC believed best suited its own requirements.

*Parcel 49C,* No. 92–286C, slip op. at 3. Therefore, FCC asserted that buildings meeting SFO 88–100's minimum requirements would not necessarily provide the FCC with an acceptable operational environment. FCC's final Source Selection Report preferred Warner as the most advantageous offeror. Parcel 49C ranked second.

The rent offer for the Warner Building, however, exceeded the authorized ceiling. The Warner facility offered 288,000 square feet of space. Nonetheless, on December 9, 1991, FCC asked GSA to award the lease to Warner and "deal with additional space needed later."

On December 20, 1991, GSA selected Parcel 49C for the award. Warner withdrew its proposal. Through a series of letters, FCC indicated its dissatisfaction with the award. FCC renewed assertions that its space requirements had increased and that, because the Parcel 49C building—the Portals—was not yet under construction, it could not meet the occupancy date. The Court of Federal Claims found:

> After GSA informed FCC that the Portals had been selected for FCC headquarters, FCC responded with a campaign to scuttle the procurement.... We found credible the testimony of GSA officials who stated that FCC intended to take whatever steps were necessary to avoid going to the Portals. Concerns FCC said it had with the procurement became critical to FCC only when Portals was selected.

*Parcel 49C,* No. 92–286C, slip op. at 3–4.

With bid protest proceedings still pending at GAO, FCC wrote GAO on January 17, 1992, conceding the occupancy date protest. This direct contact violated GAO procedure. In the words of the trial court, "FCC's stated position to GAO was a sudden and complete reversal, announced only after Parcel 49[C] was selected as the prospective awardee." *Id.* at 4.

On January 24, 1992, FCC sent GSA an SF–81 increasing their space request to 335,588 square feet. On February 10, 1992, GSA cancelled SFO 88–100. GSA based its cancellation on FCC's changed space needs.

Thereafter, on April 17, 1992, Parcel 49C filed a complaint in the Court of Federal Claims protesting GSA's cancellation of the solicitation. Following trial, the Court of Federal Claims granted injunctive relief to Parcel 49C. The injunction required GSA to proceed with award of the solicitation by March 15, 1994.

Approximately two weeks after the bench trial, on March 14, 1994, the court issued its opinion which based the injunction on GSA's abuse of its discretion to cancel procurements. Pending appeal, this court issued a temporary stay. *Parcel 49C Limited Partnership v. United States,* Order No. 94–5085 (Mar. 14, 1994).

## DISCUSSION

### I.

In harmony with the Federal Rules of Civil Procedure, the rules of the Court of Federal Claims require issuance of findings of fact and conclusions of law supporting a judgment. Rule 52(a) states:

> In all actions tried upon the facts, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action.

Rule 65(d) further states:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document the act or acts sought to be restrained; and is binding only upon the parties to the action.

■ In consonance with these rules, the trial court must supply adequate findings of fact and conclusions of law to support its order or judgment. *Mayo v. Lakeland Highlands Canning Co.,* 309 U.S. 310, 316, 60 S.Ct. 517, 520, 84 L.Ed. 774 (1940); *Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1575 (Fed.Cir.1990). Neither the Rules of the Court of Federal Claims nor the Federal Rules of Civil Procedure, however, require issuance of findings and conclusions at the same time as the order or judgment. Moreover, because some motions for an injunction require immediate resolution, a requirement of simultaneous issuance of findings and conclusions might well prove unworkable.

■ In this case, the trial court issued its findings and conclusions two weeks after its injunctive order. Neither party suffered any prejudice from this slight interlude between the order and the supportive factual and legal reasoning. Therefore, this court detects no error in the trial court's issuance of its findings and conclusions after the injunctive order. The Court of Federal Claims properly issued findings and conclusions under the requirement of Rules 52(a) and 65(d).

This result does not conflict with *Chemlawn Services Corp. v. GNC Pumps, Inc.,* 823 F.2d 515, 517 (Fed.Cir.1987). In *Chemlawn,* the district court did not issue findings and conclusions until five months after grant of a preliminary injunction from the bench and two-and-one-half months after issuance of a written temporary restraining order. Applying the law of the United States Court of Appeals for the Fifth Circuit, this court reversed the injunction for lack of proper findings and conclusions to support the order under Rule 52(a).

*Chemlawn* thus differs from this case in two important ways. First, this court does not apply Fifth Circuit law in a case emanating from the Court of Federal Claims. Second, by the time the findings and conclusions issued in *Chemlawn,* the district court no longer had jurisdiction. The party had already appealed to this circuit. Because the notice of appeal divested the district court of jurisdiction, the trial court had no jurisdiction to issue its findings and conclusions. In this case, the trial court retained jurisdiction to enter its findings and conclusions because the United States did not file its Notice of Appeal in the trial court until receipt on March 16, 1994.

### II.

■ This court reviews the trial court's findings of fact for clear error and its legal conclusions *de novo. Alger v. United States,* 741 F.2d 391, 393 (Fed.Cir.1984). The legal question before the Court of Federal Claims was whether the Government met its implied contractual obligation, under *Prineville Sawmill Co. v. United States,* 859 F.2d 905 (Fed.

Cir.1988), to consider fairly and honestly all responsive bids. To answer this question, the court made several findings of fact and credibility determinations.

The trial court found that the contracting officer's primary stated reason for cancellation, the change in FCC's space requirements, was merely a pretext for accommodating FCC's displeasure with the selection of Parcel 49C. Additionally, the court found that the occupancy date, raised at trial as a contributing factor for the cancellation, was not a credible justification.

The trial record contained substantial evidence showing that, in the words of the trial court, "FCC intended to take whatever steps were necessary to avoid going to Portals." For instance, Mr. Richard Austin, the Administrator of GSA, testified: "[The FCC] would take whatever steps necessary to cause this [procurement] not to go to Portals." Similarly, an attorney for Parcel 49C testified:

> [M]y view was that the FCC's reasons for objecting to the Portals were all together that they just did not like the site. They didn't like the site and they were using any excuse they could to throw roadblocks in the way of the final signing of an agreement between GSA and Parcel 49C.

In sum, the record amply supports the trial court's finding that the FCC launched "a campaign to scuttle" an award to Parcel 49C.

■ In this context, FCC's December 9, 1991 request that GSA award the contract to Warner takes on telling significance. On that date, FCC would have willingly accepted 288,000 square feet of space in the Warner Building. In the hope of relocating to the Warner Building, FCC evinced a willingness to postpone any concerns about additional space. Yet, only a few weeks later, after selection of Parcel 49C, FCC changed its future space demands to exceed the space proffered at the Portals. In the context of an FCC campaign to scuttle the procurement, GSA's selection of Parcel 49C on December 20 explains much about the inconsistency between FCC's space needs on December 9 and January 24.

Moreover, the record, particularly testimony from Mr. Austin, showed that GSA might have accommodated FCC's new space demands at the Portals with a supplemental lease or additional acquisition authority. According to Mr. Austin, these methods are "standard operating procedure" for addressing changes in space needs for large deals when the award follows the space determination by several years. However, on January 17, 1992, FCC sent a letter directly to GAO undercutting GSA's defense of the Far East Trading protest. Mr. Austin testified that FCC's new space request, when coupled with FCC's unexplained Far East Trading protest concessions, "backdoored" GSA into cancelling the procurement.

Before selection of Parcel 49C, FCC had consistently insisted that the occupancy date was critical to modernization of FCC information systems. In fact, FCC had requested renewal of leases in its current buildings to facilitate installation of its new computer network in the event the procurement exceeded the occupancy date. Again, GSA's selection of Parcel 49C does much to explain the FCC's wholly unexpected reversal of its insistence on the SFO 88–100 occupancy date.

In sum, the record shows inconsistencies between FCC positions on space and occupancy date immediately before and immediately after GSA's selection of Parcel 49C. The record also contains ample evidence of FCC's campaign to avoid the Parcel 49C procurement. The record shows that FCC's campaign succeeded in compelling GSA to cancel illegally the procurement. In the context of the entire record, this court detects no clear error in the factual findings of the Court of Federal Claims.

The record thus amply supports the trial court's findings that the Government's justifications for cancellation of the procurement were pretextual and incredible. Without a valid reason for cancelling the procurement, this court sustains the trial court's conclusion of law that the Government violated its duty to conduct a fair procurement. *See Keco Indus. v. United States*, 492 F.2d 1200, 1205 (Ct.Cl.1974).

## III.

In *Heyer Products Co. v. United States,* 177 F.Supp. 251, 252 (Ct.Cl.1959), this court's predecessor established a governmental duty to conduct fair procurements. The Court of Claims reasoned that, by soliciting for bids, the Government impliedly promises to give honest and fair consideration to all bids. *Id.*

However, before 1970, a disappointed bidder had no standing to challenge the award of a contract in court because the statutes and regulations governing the award process purportedly only protected the Government. *CACI, Inc.–Federal v. United States,* 719 F.2d 1567, 1572 (Fed.Cir.1983); *see also Perkins v. Lukens Steel Co.,* 310 U.S. 113, 125–26, 60 S.Ct. 869, 875–76, 84 L.Ed. 1108 (1940) (superseded by statute as stated in *CACI,* 719 F.2d at 1572.) This doctrine, insulating the Government from procurement violations, changed in 1970. *Scanwell Lab., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970).

*Scanwell* involved bids for instrument landing systems at airports. The Federal Aviation Administration granted a contract for these systems to the lowest bidder. Scanwell protested that the lowest bid did not meet the written requirement excluding bidders without at least one system already in operation. Scanwell brought suit to nullify the allegedly illegal award.

The United States Court of Appeals for the District of Columbia Circuit determined that section 10 of the Administrative Procedure Act gave the disappointed bidder standing. *Id.* at 869. Our sister circuit reasoned that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law:

> [T]here is no right in Scanwell to have the contract awarded to it in the event the district court finds illegality in the award of the contract. . . . The public interest in preventing the granting of contracts through the arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general."

*Id.* at 864. Thus, *Scanwell* did not grant a disappointed bidder an automatic benefit from prevailing in a bid protest, but instead clarified that the absence of direct benefit to protestors is not a bar to their standing.

In *CACI,* this court stated that Congress intended the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 39–40 (current version of relevant provision at 28 U.S.C. § 1491(a)(3) (1988)), to make the *Scanwell* doctrine applicable to the Claims Court. *CACI,* 719 F.2d at 1574. *CACI* involved a contract to supply automated data processing to the Antitrust Division of the Department of Justice. CACI, a disappointed bidder, challenged the bid process because of alleged prior professional and social relationships between members of the Technical Evaluation Committee and the vice president of the company with the successful bid.

In *CACI,* this court held that standing does not require proof that award would have been to the disappointed bidder absent the illegal act. CACI asserted that its injury occurred when "the government's breach of its implied contract to deal fairly with all bidders denied CACI the opportunity to have its bid considered solely on its merits." *Id.* at 1575. This court added the following:

> *Scanwell* itself recognized that a disappointed bidder has "no right . . . to have the contract awarded to it in the event the . . . court finds illegality in the award of the contract. . . ."

*CACI,* 719 F.2d at 1575 (omissions in original) (quoting *Scanwell,* 424 F.2d at 864). However, as discussed, the language from *Scanwell* addresses only the question of standing to raise a bid protest, not the remedy for a successful challenge.

In fact, the discussion of *Scanwell* in *CACI* is arguably dicta. Indeed, in *CACI,* this court stated that an injunction to halt the contract award was the correct remedy for illegality in the bid process:

> An injunction barring the award would correct this alleged injury since it would require the government, if it wants to go ahead with the procurement, to repeat the

bidding process under circumstances that would eliminate the alleged taint of the prior proceedings.

*CACI,* 719 F.2d at 1575. In *CACI,* however, this court detected no bias or favoritism in the selection process. The Government had no obligation to take steps to remove any taint from the proceedings. Nonetheless, *CACI* recognizes the legality of an injunction to remedy illegality in the bidding process.

The record in this case supports the trial court's conclusion that illegality permeated the cancellation of SFO 88–100. FCC engaged in a campaign to scuttle the procurement once it became clear that award of SFO 88–100 would result in a move to the less desirable southwest quadrant of Washington, D.C. FCC's campaign enjoyed success with GSA until the Court of Federal Claims enjoined the cancellation.

█ The Government now attempts to preserve its ill-gotten gain by invoking inapplicable language from *Scanwell.* The *Scanwell* language says that a contractor has "no right" to receive a contract award in the event of illegal Government bid processes. *Scanwell,* 424 F.2d at 864. In this case, however, the trial court did not order the award of the contract to Parcel 49C. Instead, the trial court properly enjoined the illegal action and returned the contract award process to the status quo ante any illegality. Before the illegal cancellation, GSA had announced the intended award to Parcel 49C. The court's injunction, however, does not order the award of the contract to Parcel 49C. The court's order merely restores the posture of the process before the illegal cancellation. The award process is not complete. The process will commence from where it left off with the contract award flowing from an orderly and lawful proceeding. The Court of Federal Claims' injunction has the effect of returning SFO 88–100 to its pre-cancellation posture and removing the illegal taint.

*CACI* acknowledged the injunctive powers granted the Court of Federal Claims by the Federal Courts Improvement Act of 1982. *CACI,* 719 F.2d at 1574. The Act added 28 U.S.C. § 1491(a)(3) (1988), giving the Claims Court jurisdiction to

afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.

The United States Senate and House Judiciary Committees issued reports acknowledging the Court of Federal Claims' injunctive powers. The reports emphasized the limits of the role the court should play in the procurement process—leaving the choice of contractor up to the Government. S.Rep. No. 97–275, 97th Cong., 2nd Sess. 23 (1981), *reprinted in* 1982 U.S.C.C.A.N. 11, 33. This court has reiterated that equitable powers "should be exercised in a way which best limits judicial interference in contract procurement." *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983). The House report also emphasized the importance of legality when committing public funds. H.R.Rep. No. 97–312, 97th Cong., 2nd Sess. 43 (1981) 1982 U.S.C.C.A.N. 11, 43. In this case, the Court of Federal Claims has properly utilized its power to grant injunctive relief in pre-award bid protests.

█ When sound judicial discretion so dictates, a movant may obtain permanent injunctive relief by showing no rational basis for the actions of executive officials. *See Honeywell, Inc. v. United States,* 870 F.2d 644, 647 (Fed.Cir.1989), *CACI,* 719 F.2d at 1572; *see also M. Steinthal & Co. v. Seamans,* 455 F.2d 1289 (D.C.Cir.1971). In the instant case, Parcel 49C bore the burden of showing that GSA's cancellation of SFO 88–100 was arbitrary or capricious. A necessary corollary to that burden is consideration of the discretion accorded to procurement officials. *See M. Steinthal,* 455 F.2d at 1301.

█ As discussed, Parcel 49C showed that GSA had no rational basis for the cancellation. The law of procurement does not tolerate "actions reflecting personal predilections of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence." *Id.* at 1305–06. Certainly GSA officials wield no discretionary power to suc-

**1154**

cumb to pressures such as those exerted by FCC.

■ Injunctive relief in this case better serves the public interest than the other possibility, resolicitation. Resolicitation would only result in further, unnecessary expenditures of Government resources. Indeed, resolicitation would also reward the illegality, accomplishing nothing more than a stern finger wagging in the direction of FCC and GSA. The Government has shown no likelihood of material harm to its interests from an injunction. Indeed, GSA can seek increased space for FCC through legal channels.

This court finds no error in the award of injunctive relief to Parcel 49C. Imposition of an injunction is consistent with the Court of Federal Claims' limited role. The injunction will remove the taint of illegality from this procurement process without interfering with the Government's discretion to select its own contractors.

### IV.

■ Although determining that this record permits the grant of an injunction, this court must also evaluate whether, in fact, cancellation was the proper remedy when the contractual needs of the Government may have changed. *SMS Data Products Group, Inc. v. Austin,* 940 F.2d 1514 (Fed.Cir.1991), is not applicable to the instant case. *SMS* stated that the General Services Board of Contract Appeals lacks power to direct award of a contract under the Brooks Act. *Id.* at 1517. *SMS* also engaged in discussion about the broad authority of the contracting officer to amend or cancel a solicitation when the Government has changed its requirements. *Id.* at 1518. In this case, however, the injunction does not direct the contract award to a particular bidder. This injunctive remedy merely restores the status quo ante the illegal cancellation. The Government retains the power to proceed with its award process or to terminate the award process for any legal reason. These legal processes can accommodate FCC's present and future space needs. FCC was willing to use these processes on December 9, 1991, when it requested an award to Warner for essentially

no more space than was available in Parcel 49C's offer.

In sum, the injunction merely restores the posture of the Government and Parcel 49C before the illegal cancellation. Parcel 49C must still undergo the approval process. Presumably, this process will also be a tool to accommodate FCC's space and occupancy date needs.

### CONCLUSION

The trial court found that the Government's cancellation of SFO 88–100 lacked proper legal basis. The Government did not show that the trial court's findings of fact were clearly erroneous. The trial court properly awarded injunctive relief to remedy this illegal cancellation. Of course, the dates in the injunction issued by the trial court are no longer current. In accordance with this opinion, the solicitation should resume where it left off on February 10, 1992. GSA should proceed with due diligence to comply with the spirit of the trial court's injunction and to proceed toward award of SFO 88–100 without unnecessary delay. This court affirms-in-part and modifies-in-part the judgment of the Court of Federal Claims.

*AFFIRMED IN PART* and *MODIFIED IN PART.*